Norma Hill, Appellee, v. Louis Alexander and Frances Terry, Trading as Felix Cocktail Lounge et al., Appellants.

Gen. No. 42,713.

Heard in the third division of this court for the first district at the June term, 1943.
Opinion filed February 2, 1944.

LORD, BISSELL & KADYK, of Chicago, for appellants; LEONARD F. MARTIN, BRUCE S. PARKHILL and HAROLD E. BAILY, all of Chicago, of counsel.

CLARENCE M. DUNAGAN, of Chicago, for appellee.

MR. JUSTICE BURKE delivered the opinion of the court.

A complaint filed in the superior court of Cook county on May 9, 1941 by Norma Hill against Louis Alexander and Frances Terry, doing business as Felix Cocktail Lounge, Eleven Eleven Lawrence Corporation and First National Bank of Chicago, individually and as trustee, charges that on or about January 13, 1941 Louis Alexander and Frances Terry, doing business as Felix Cocktail Lounge, operated a tavern at 1101 Lawrence avenue, Chicago, by and with the consent of Eleven Eleven Lawrence Corporation, owners of the premises; that on that date Louis Alexander and Frances Terry sold or served liquors to one Sol, causing his intoxication in whole or in part; that plaintiff was lawfully upon the premises and was at all times exercising ordinary care for her own safety; that Sol, while intoxicated and as a direct result of the intoxication, walked or staggered through the doors leading to the outside of the cocktail lounge, and as a direct result of the intoxication staggered and fell against the doors of the lounge and did then and there kick loose a door stop which was holding the door open and caused the door to swing shut in and upon the hand of the plaintiff; that as a proximate result plaintiff was greatly hurt, bruised and wounded, and divers bones of her hand and arm were broken, crushed and maimed, and she sustained permanent injuries to various parts of her right hand and right arm, and amputation of the small finger of the right hand, to the damage of plaintiff in the sum of $5,000. The bank, individually and as trustee, was dismissed from the case. The complaint was amended on its face by alleging that the date of the occurrence was January 18, 1941. Defendant answering, admitted ownership of the premises and the sale of alcoholic liquor therein, but denied all other allegations. A trial before the court and a jury resulted in a verdict against defendants for $2,250. Motions for a directed verdict, judgment notwithstanding the verdict and for a new trial were denied, and

judgment was entered on the verdict, to reverse which this appeal is prosecuted.

Lawrence avenue runs in an easterly and westerly direction. The tavern is located on the south side of Lawrence avenue, facing north. The main entrance to the tavern is on Lawrence avenue. Along the east wall is a row of booths and along the west wall is a 20 foot bar running north and south. The bar does not run all the way up to the north wall. There is a door from the street leading to a small vestibule, and an inside door from the vestibule to the tavern. Both doors opened out. The hinges of the inside door were on the west jamb and when the door was opened it swung in a northwesterly direction. The distance in the vestibule between the outside and inside doors is about five feet, and the distance between the vestibule door and the first booth is about ten feet. The only testimony introduced by plaintiff was that of herself. She testified that she arrived at the tavern about 2:00 p. m. on Saturday, January 18, 1941, where she met her father. They sat in the second booth from the north end. When she first sat down she observed other patrons at the bar. She testified that as she sat eating lunch she observed a man whom she identified as Sol; that he was eating and drinking; that the bartender poured several drinks of whiskey for him; that Sol got up and walked towards the back and that he "kind of staggered"; that he came back to the bar in a few minutes, sat down and began drinking again; that Sol was rather loud in manner of speech; that after he came back to the bar he had three or four more drinks of whiskey; that she was in the booth with her father for about a half an hour; that then she arose and walked to the music box for the purpose of putting a coin in the slot and playing a record; that the music box was located against the north wall, just west of the vestibule door and on the same side of the tavern as the bar; that it was "right up against the door I

came in." The machine faced south or toward the back of the tavern, and was of the type in which a person first places a coin and then makes a selection. She testified further that as she stood there her left hand was going over the selections on the music box; that she had her fingers over the numbers; that her right hand was on the jamb of the door, with her fingers in the crack between the open door and the jamb; that she stood there with her head bent forward and facing north; that when she entered the tavern the inner door was open; that as she stood in this position Sol came staggering down and started out the door and bumped the door, and as he started to close it he fell back against it, and the first thing she knew her finger was caught in the door; that "This man I know as Sol is not tall nor is he light but he is not fat." She testified further that after the accident her father came over to see what was wrong; that one of the customers of the tavern accompanied her to the office of Dr. H. C. Warren, located in the same block as the cocktail lounge; that her father did not accompany her to the office of the doctor, and that her father later appeared at the doctor's office. She was in Dr. Warren's office for about 20 minutes. He treated her finger and bandaged it. She saw him on Monday, when he changed the dressing. At his direction she went to the American hospital Thursday and remained there until the following Monday afternoon. The day after arriving at the hospital her finger was operated on by Dr. Warren and an anesthetic was administered for the operation. She suffered severe pain, which continued for almost two weeks. At the end of that period she went back to work, but only worked two days. Then she was off work for a month. The bandage remained on her finger until May 1941. Dr. Warren died about six weeks before the trial. She went to his office about three times a week until May. She further testified: "My finger had to be operated on again. It is very sensitive

and it has a nail on it that has to be removed. I went to Dr. Warren just three weeks before he died and he told me to come back and he would remove the nail, but before I got a chance to go back he died." She testified further that at the time of the trial her father was employed in the shipyards at Orange, Texas, where he had been since April 1942. She stated that when she went to the music box Sol was sitting at the back end of the bar; that after she got to the music box he started to go out; that he was staggering at that time; that he got off his chair and staggered to the front door; that the door was open; that after he went through the door in the vestibule he fell and staggered against the door. Asked: "And his shoulder bumped the door, is that it?", she answered: "Yes." Asked: "Then what did he do?", she answered: "Then the door started to close and he lost his balance and just kind of fell back against the door and then he straightened up and walked out." She testified that when Sol fell back against the door he pushed it the rest of the way shut; that Sol then walked out; that she had not seen Sol from the day of the accident up to the time of the trial; that she knew the newsboy; that at the time of the occurrence the newsboy was sitting by a table near the east wall.

Fred Solomon testified on behalf of defendant that he is generally called Sol; that he had been employed for six years in collecting from and repairing music machines, and that at the time of the occurrence he was employed by the man who owned the music machine located in the Felix Cocktail Lounge, where he had occasion to go four or five times a week; that on the day of the occurrence he had occasion to be in the restaurant, which is next door west from and connected with the tavern, around 3:00 p. m.; that he was in the tavern part approximately three minutes talking to Mr. Terry, father of the defendant Frances Terry. Mr. Terry was the only one behind the bar at the time.

Witness further testified that he had something to eat in the restaurant part, which is separate from the tavern; that he drank coffee but had no alcoholic liquor; that he was in the restaurant talking to Miss Frances Terry when the waitress came in and told Miss Terry about the accident; that prior to this time he had neither gone in or out of the front door of the tavern, having entered the premises through the restaurant door; that at the request of Miss Terry he took plaintiff to Dr. Warren's office, returning to the tavern. He testified further that he was sober; that he never drinks whiskey and that he did not observe anyone in the tavern talking in a loud voice or who appeared intoxicated. Mr. James Terry, father of Miss Terry, testified on behalf of defendants that at the time of the accident he was the only one tending bar; that the only patrons in the tavern just before the accident were the plaintiff and her father, Mr. Pike; that Mr. Solomon was in the restaurant side at the time of the occurrence; that plaintiff was at the victrola and had her hand against the door which closed; that her father went out the front door on his way home; that the door evidently caught plaintiff's finger nail; that after the accident Mr. Solomon came in from the restaurant and that Frances Terry came in later. He testified further that up to the time of the accident he had not served any liquor to Mr. Solomon that day; that there was no intoxicated person sitting at the bar before the accident or anyone talking in a loud voice; and that Ray, the newsboy, was standing right in the center near the front door, but he did not touch it. Defendant Frances Terry testified that at the time of the occurrence she was in the restaurant part talking to Fred Solomon when she first heard of the accident; that she asked Mr. Solomon to take plaintiff to the doctor's office and that he did; that when she went into the tavern after the accident she did not see Mr. Pike; and that she did not hear anyone in the tavern ordering drinks in a loud

voice. Mr. Raymond Bruski testified on behalf of defendants that he is a news dealer and operates a newsstand in front of the cocktail lounge; that at the time of the accident he was standing in the vestibule warming up; that he was acquainted with plaintiff; that the door between the vestibule and the tavern was propped open part of the morning; that he did not notice it immediately before the accident; that the accident happened in the early afternoon; that the upper part of the door is made of glass; that "you could see through the doors half way"; that "standing in the vestibule you could partly see the tavern through the window in that door"; that his attention was called to the accident by the girl's gasp of pain; that he was gazing at the bartender before the cash register; that Mr. Solomon had just gone into the kitchen; that he knew plaintiff's father, whose name was Pike; that he saw her father immediately before the accident; that the father was crippled; that he saw him come in and saw him go out; that the witness was in the vestibule at the time the father went out; that the father turned east and walked away; that at the time witness heard the girl gasp she was in front of the juke box, on one side; that she had one hand on the juke box and one hand on the door; that she was holding the inside jamb of the door about three feet above the floor; that at that time Mr. Terry was behind the bar; that as far as witness knew he, witness, was the only one within arm's reach of the door, or who could have touched it, at or just before the time of the accident; that Mr. Pike had just gone out and the door took some time to slam; that by that time Pike was "25, 50 feet away"; that Pike opened the door; that witness may have pushed against the door; that no one else touched the door; that witness did not touch the door at the time of the accident or before the accident. Asked: "When that door started to slam, what made it slam?", he answered: "The inertia of the spring." Asked: "Well,

who had opened it?'', he answered: "Mr. Pike." Witness testified further that he was on speaking terms with a man having the nickname of Sol, who was at the tavern at that time; that he learned after the accident that the full name of Sol was Fred Solomon; that Sol was in the kitchen at the time the accident happened; that the kitchen was located at the southwest part of the tavern, behind the restaurant, connected by a passage door; that witness had seen Solomon 15 or 20 minutes before the accident, going in the direction of the kitchen; that at that time he appeared to be sober; that witness saw Solomon when he escorted plaintiff to the doctor; that at that time Solomon was calm and collected and appeared to be sober. Witness testified further that he could not testify as to the sobriety of Mr. Pike; that plaintiff was sober.

Plaintiff, in rebuttal, testified that the Fred Solomon who testified for the defendant was not the "Sol" about whom she testified in her case in chief. Asked as to whether Mr. Solomon was the man who took her to the doctor, she answered that she did not know.

The first point urged by defendants is that an action under the Illinois Dram Shop Act for damages for personal injuries cannot be maintained where the damages are not the result of the violation by the intoxicated person of any legal duty to the person injured, and that there is no proof that the damage sustained by plaintiff was the result of a wrongful or tortious act of Sol, the alleged intoxicated person, and that hence as a matter of law plaintiff cannot recover. Plaintiff replies that whether Sol's intoxication was the proximate cause of her injuries, whether she was in the exercise of due care for her own safety, and whether the intoxicated man was negligent, were all questions of fact properly left to the jury to determine, and that the verdict returned is supported by the evidence. Plaintiff calls attention to the fact that the court gave, at the instance of defendant, an in-

struction requiring the plaintiff to prove by a preponderance of the evidence, among other things, that immediately and before the time of the accident she was in the exercise of ordinary care for her own safety, and another instruction that if the jury found from the evidence that at or immediately before the accident she was not in the exercise of ordinary care, that she was negligent, and that such negligence contributed to cause the accident, then the jury should find the defendants not guilty. Plaintiff does not complain of these instructions. This case arises under the provisions of section 14 of the Dram Shop Act (sec. 135, ch. 43, Ill. Rev. Stat. 1943 [Jones Ill. Stats. Ann. 68.042]), which reads:

"Every husband . . . or other person who shall be injured in person . . . by an intoxicated person, or in consequence of the intoxication . . . of any person, shall have a right of action . . . against any person or persons who shall by selling or giving alcoholic liquor have caused the intoxication . . . of such person . . . ."

Defendants, speaking of the right of action given to those persons "injured" by an intoxicated person, urge that the word be given its well accepted meaning at common law. They maintain that the word "injured" in the text means a wrongful act resulting in damages, the invasion of a legal right of the plaintiff, the violation of a legal duty of the defendant. Defendants insist that there is no evidence of negligence on the part of Sol and that the proof shows that plaintiff was guilty of contributory negligence as a matter of law. From the statement of the respective positions it will be observed that plaintiff concedes that the burden was on her to prove by a preponderance of the evidence that Sol's intoxication was the proximate cause of her injuries; that Sol was negligent and that she was in the exercise of due care for her own safety.

Both parties state that the case is based on the Dram Shop Act, yet they state their respective positions as though the case were tried as a common-law action involving proof of negligence, proximate cause and due care. It is difficult to know from the complaint in the instant case whether the plaintiff is relying on the Dram Shop Act or on the common law. In *King v. Haley*, 86 Ill. 106, speaking of this section of the Dram Shop Act, the court said (108):

"A cause of action is given to any one who may be injured in his person or property, or means of support, by any intoxicated person, jointly or severally against such person or persons who may have caused the intoxication, in whole or in part, of the person who commits the injury. An action is also given to any one who may in the same manner be injured 'in consequence' of the intoxication of any one, whether habitual or otherwise, against the parties who may cause such intoxication. In the one case it is for the direct injury inflicted by 'an intoxicated person,' and in the other it is for such damages as may arise 'in consequence' of such intoxication. This is the plain meaning of this section of the statute as expressed in unambiguous language. The General Assembly have seen fit to enact that any one who may be injured by any 'intoxicated person,' either in his person or property, or means of support, may have a cause of action against the parties who may have caused the intoxication of the person who commits the injury, and we have no rightful authority by judicial construction to deprive such party of the right secured, which to him in many instances may be of the utmost value. What reason is there why there should not be an action for the direct damage done by a drunken person, as well as damages that arise in consequence of such intoxication? The injury to the 'person' is most likely to be the direct act of the 'intoxicated person,' and the injury to the 'means of support' would generally arise

in 'consequence of the intoxication' incapacitating the party for attending to business, or causing him to waste his estate.''

A party complaining of the wrongful act of a tavern keeper in causing the intoxication of another, from which damage results to him, must not be an active and willing agent with the tavern keeper, assisting in causing such intoxication. However, this does not state a rule of contributory negligence. It is founded on the principle that no person can profit by his own wrongdoing, or recover for an injury from a force put in motion by his own wrongful illegal act. In *Jury v. Ogden,* 56 Ill. App. 100, plaintiff 25 years of age and unmarried brought action under the Dram Shop Act for alleged injury to her means of support caused by the intoxication of her father, produced by liquor sold to him by the defendant. She obtained a judgment for $1,200. She was not a pauper, nor was there any contract between them binding her father to support her. The proof was ample that when sober he was what a father should be, and there was no reason to doubt that but for his intoxication she would have remained with and been supported by him so long as she lived. The court said (105):

''It is obvious that the injury in person or property mentioned in this act is an injury to or in violation of a legal right, in actual enjoyment before and at the time of the injury thereto; and the means of support are put in the same category. The question is whether they also must be of legal right, that is, given by law, and in like actual enjoyment, to support an action for injury in respect thereof under this act, or will it suffice that they are in actual enjoyment without any claim of right thereto which might be enforced by law.''

This case is support for defendants' contention. In *Whiteside v. O'Connors,* 162 Ill. App. 108, the court said (116):

"We conclude that if the husband of plaintiff in error committed suicide while in the state of intoxication and the defendants in error contributed in whole or in part to produce such intoxication the rule announced in *Jack v. Globe, supra,* is applicable, and that it was only incumbent upon plaintiff in error to show that the intoxication of her husband was the cause of his suicide, either proximate or remote. See also *England v. Cox,* 89 Ill. App. 551. If, however, a recovery is sought by plaintiff in error for injury to her means of support in consequence of the intoxication, habitual or otherwise, of her husband whereby he neglected his business and became impoverished, or whereby he became deranged or despondent and committed suicide, it is incumbent upon plaintiff in error to show that the intoxication habitual or otherwise of her husband, which intoxication was caused in whole or in part by defendants in error, was the proximate cause of injury to her means of support in the manner indicated."

The common law gives no remedy for injury or death following the mere sale of liquor to the ordinary man, either on the theory that it is a direct wrong, or on the ground that it is negligence which imposes a legal liability on the seller for damages resulting from the intoxication. The reasoning of these cases is that the drinking, not the selling, is the proximate cause of the injury. In *Bistline v. Ney Bros.,* 134 Iowa 172, the Supreme Court of Iowa made an exhaustive study of the subject we are considering. The court said (page 177):

"It is to be remembered that this statute creates a new right of action, and, to sustain such action, the person injured is not required to establish all the elements of an injury actionable at common law. It is enough if the facts alleged and proven include all the elements which the statute upon reasonable and fair construction may be said to prescribe. . . . The very purpose of the statute is to extend such liability to

include injuries which, under the common law, would be held too remote.''

In *Volans v. Owen*, 74 N. Y. 526, plaintiff's minor son, a young man about 20 years of age, living with his father, went to Ogdensburg and procured at various hotels and saloons intoxicating liquors, and becoming intoxicated, fell and injured his head. In consequence he became sick and for several months was confined to his bed in his father's house. Plaintiff sued for damages on the ground that he was subjected to medical and other expenses of his son's illness and was deprived during the time of the services which the son had been accustomed to render upon his farm. The New York court of appeals said (529):

''One of the grounds urged in support of this exception is that the injury, for which an action lies under this statute, must be one for which, by the pre-existing law, a remedy by action existed. It is claimed that the act does not create a cause of action for an injury not before remediable by action, and that the only change wrought by the act was to extend the pre-existing remedy, so as to make the vendor of liquors and the landlord, under the circumstances specified in the act, liable for injuries committed by an intoxicated person, instead of confining the remedy to the immediate wrong-doer, according to the general rule of the common law. This construction of the statute is inadmissible. Both direct and consequential injuries are plainly included in the remedy given, and the Legislature, by giving a right of action for injury to 'means of support'—a cause of action unknown to the common law—evidently intended to create a new ground and right of action.''

It will be observed that the New York court called the intoxicated person ''the immediate wrongdoer.'' We agree with the statement in the case of *Sauter v. Anderson*, 112 Ill. App. 580, that in the Dram Shop Act the legislature did not intend to

make the seller of liquor responsible for all the acts of the buyer while intoxicated thereby, when the acts were not in any way caused by the intoxication. The liability is for injuries to others done by the intoxicated person, or resulting from his intoxication, and not for anything else. If, for instance, an intoxicated person is killed by lightning, or a shot by a highway man, or a burglar, or meets with other misfortune having no reasonable or logical relation to his drunkenness, no one would think of asserting a cause of action in favor of his dependents against the seller. If it appears that notwithstanding the drunkenness the injurious act is wholly chargeable to some other cause or influence, or that the injury was not caused by the wrongful act of the intoxicated person, then judgment should be entered for the defendants. In the *Bistline* case, the Iowa court further said (182):

"While cases may be found in which the ordinary rule of proximate cause is spoken of as applicable to claims for recovery of damages for injury done by an intoxicated person, there is scarcely one in which a recovery has been sustained that such rule is not ignored or treated as superseded by the statute. For instance, where the owner of a building let his property for saloon purposes, and the tenant sold liquor to a third person who became intoxicated thereon, and in such a condition abused and caused the death of a horse owned by a fourth person, the latter was permitted to recover damages from the landlord. *Bertholf v. O'Reilly,* 74 N. Y. 509, (30 Am. Rep. 323). See, also, *Dunlap v. Wagner,* 85 Ind. 529 (44 Am. Rep. 42). Again, where the intoxicated person undertook to drive home and fell in such manner as to be beaten to death by the wheel of his own wagon, the wife was held entitled to recover. *Mead v. Stratton,* 87 N. Y. 493 (41 Am. Rep. 386). The seller has been held liable for damages suffered by reason of an assault committed by the intoxicated person. *English v. Beard,* 51 Ind.

489; *Mastad v. Swedish Brethren,* 83 Minn. 40 (85 N. W. 913, 53 L. R. A. 803, 85 Am. St. Rep. 446); *Pickard v. Tearo,* 34 Ill. App. 398; *Doty v. Postal,* 87 Mich. 143 (49 N. W. 534).; *McClay v. Worrall,* 18 Neb. 44 (24 N. W. 429). Injury to the wife's means of support by the suicide of the husband while intoxicated affords a right of action. *Lawson v. Eggleston,* 52 N. Y. Supp. 181 (28 App. Div. 52, affirmed in 164 N. Y. 600, 59 N. E. 1124); *Blatz v. Rohrbach,* 42 Hun (N. Y.) 402. This case was reversed upon appeal, but not upon the point here referred to. In Indiana, it is held that a wife may recover damages for injury to her means of support occasioned by the imprisonment of her husband for a crime committed while intoxicated upon liquors sold him by the defendant. *Homire v. Halfman,* 156 Ind. 470 (60 N. E. 154). She may recover for an assault upon herself by her husband while intoxicated. *Wilson v. Booth,* 57 Mich. 249 (23 N. W. 799); *Schlosser v. State,* 55 Ind. 82. So also where the injury is occasioned by the reckless driving of a horse by an intoxicated person. *Aldrich v. Sager,* 9 Hun. (N. Y.) 538; *Hackett v. Smelsey,* 77 Ill. 108; *Mulcahey v. Givens,* 17 N. E. 598 (115 Ind. 286). For other illustrative cases, see *Boos v. Sliney,* 11 Ind. App. 257 (39 N. E. 197); *Stafford v. Levinger,* 16 S. D. 118 (91 N. W. 462, 102 Am. St. Rep. 686); *King v. Haley,* 86 Ill. 106 (29 Am. Rep. 14); *Peterson v. Knoble,* 35 Wis. 80; *People v. Brumback,* 24 Ill. App. 501; *Smith v. People,* 141 Ill. 447 (31 N. E. 425); *Curran v. Percival,* 21 Neb. 434 (32 N. W. 213); *McCarty v. Wells,* 51 Hun (N. Y.) 171 (4 N. Y. Supp. 672); *Bacon v. Jacobs,* 63 Hun. 51 (17 N. Y. Supp. 323); *Bodge v. Hughes,* 53 N. H. 614; *Fortier v. Moore,* 67 N. H. 460 (36 Atl. 369); *Weick v. Lander,* 75 Ill. 93. Not all of these authorities state the rule as broadly as do the cases from Michigan and New York; but the logical tendency of all is in the same direction. As already noted, there are among them opinions which profess to apply the rule of proxi-

mate cause; but in each instance the term 'proximate' is used in the sense of an originating cause, from which the injurious effect is logically traced through an intervening series of acts or events. This rule is, of course properly applicable where the right of recovery is based upon the second clause of the civil damage statute which makes the liquor dealer liable for injury sustained 'in consequence' of the intoxication of any person. But where recovery is sought under the first clause for injury done 'by an intoxicated person,' the adjudicated cases are practically unanimous that when the plaintiff has proved the unlawful sale to a person on whom she is dependent for support, and the intoxication of such person thereby produced and an injury done by him while in that condition to her means of support, she has made the case for which the statute provides. In other words, the statute indulges in the reasonable presumption that an act done to the injury of his family by a person whose faculties are abnormally excited, or confused by drink, especially where the act is of a character not ordinarily to be expected from a sane and sober person, is the result of his intoxication. If when these have been shown the defendant claims that notwithstanding the drunkenness so wrongfully occasioned, the injurious act is wholly chargeable to some other cause or influence, it is open to him to establish that fact in defense. It is certainly not required of the plaintiff, that, after proving the wrongful sale of the liquor by defendants to her husband, his resultant intoxication, and his suicide while in that condition (and upon each of these points there was evidence on which the jury could properly find in her favor), she must then proceed to prove by a preponderance of the evidence that the deceased would *not* have committed suicide had the defendants not sold him the liquor. We find no precedent or authority imposing that burden upon her, and we can conceive of no good reason for establishing such a rule.''

The Illinois courts hold that "the party causing such intoxication in whole or in part cannot escape liability because he may not have reasonably foreseen the consequence." *Roth v. Eppy,* 80 Ill. 283.

Section 14 of the Illinois Dram Shop Act (sec. 135, ch. 43, Ill. Rev. Stat. 1943 [Jones Ill. Stats. Ann. 68.042]) provides for two separate and distinct causes of action, one for the direct injury inflicted by "an intoxicated person," and the other for such damages as might arise "in consequence of such intoxication." When the action is for the injury resulting from the direct affirmative act of an intoxicated person the doctrine of proximate cause has no application and a liability accrues upon proof of that fact, but where the action is for an injury resulting "in consequence of intoxication, habitual or otherwise," it is incumbent upon the plaintiff to show that such intoxication was the proximate cause of the injury. In the case of *Whiteside v. O'Connors,* 162 Ill. App. 108, it was held that if the husband of plaintiff committed suicide while in the state of intoxication and the defendant contributed in whole or in part to produce such intoxication, it was only incumbent upon plaintiff to show that the intoxication of her husband was the cause of his suicide, either proximate or remote. The court said (116):

"If, however, a recovery is sought by plaintiff in error for injury to her means of support in consequence of the intoxication, habitual or otherwise, of her husband whereby he neglected his business and became impoverished, or whereby he became deranged or despondent and committed suicide, it is incumbent upon plaintiff in error to show that the intoxication habitual or otherwise of her husband, which intoxication was caused in whole or in part by defendants in error, was the proximate cause of injury to her means of support in the manner indicated."

In the *Volans* case the New York court pointed out that by giving a right of action for injury to "means of support," a cause of action unknown to the common law, the legislature intended to create a new ground and right of action. That court said (529):

"The words, 'means of support' in connection with the designation of the persons, in whose favor the remedy is given, viz; husband, wife, child, parent, etc., denote that it was not alone a common law injury, or an injury before remedial by action, to which the statute was intended to apply."

A consideration of the cases under the Dram Shop Act shows that they fall into two general classifications, one where the injury to the person, property or means of support is by an intoxicated person, and the other where the injury to the person, property or means of support is in consequence of the intoxication, habitual or otherwise. In either classification an action is given to the injured person or persons against any person or persons who shall by selling or giving alcoholic liquor, have caused the intoxication in whole or in part of such person, and against any person knowingly renting, leasing or permitting the occupation of the premises and having knowledge that alcoholic liquors are to be sold therein, or who, having leased the same for other purposes, shall knowingly permit the sale of any alcoholic liquors that have caused in whole or in part the intoxication of any person. The cases are further divided into those where the intoxicated person commits suicide, is killed or incapacitated by the consumption of the intoxicating liquor, and where the plaintiff sues to recover because of loss of means of support, etc. In that class of cases the persons injured in means of support are given a right of action. That is the conclusion of the New York court of appeals in the *Volans* case referred to, when it said that the legislature in using the words "means

of support," denoted that "it was not alone a common law injury, or an injury before remedial by action to which the statute was intended to apply." There is another class of cases that has arisen under section 14 of the Dram Shop Act, and that is the one into which the instant case falls. That classification includes cases where the intoxicated person assaults third persons or where the intoxicated person causes injury to the property or person of third persons, where redress, if the assailant or wrongdoer were sober, would be sought against him by an ordinary action at common law. In that class of cases there was a remedy at common law against the assailant or tortfeasor but not against the tavern keeper or landlord. We have carefully examined the reported cases and find that where the action was by a third person for the assault or other wrong committed against the person or property of plaintiff and action brought under the Dram Shop Act that in each case the evidence showed that the plaintiff could recover at common law against the assailant or tortfeasor. In *Bertholf v. O'Reilly*, 74 N. Y. 509, the evidence showed that the horse died as a result of over-driving by plaintiff's son and that his treatment of the horse was caused by his intoxication. In *Wilson v. Booth*, 57 Mich. 249, the wife was allowed to recover for an assault upon herself by her husband while he was intoxicated. In *Aldrich v. Sager*, 9 Hun. (N. Y.) 537, plaintiff was injured by the reckless driving of a horse by an intoxicated person. In *Sauter v. Anderson*, 112 Ill. App. 580, there was evidence that Anderson, who was sober, made an unprovoked and murderous assault upon Wilder and that he killed Anderson in necessary self defense. The widow sued under the Dram Shop Act, contending that Wilder was drunk. The court said (584):

"Upon that theory, even if Anderson, who was sober, made an unprovoked and murderous assault upon Wilder, and though Wilder then killed Anderson

in necessary self-defense, yet if Wilder was then intoxicated, those who sold Wilder the liquor which made him intoxicated and the owners of the building in which the liquor was sold to Wilder, would be liable in damages to Anderson's family for Anderson's death, and of course would be liable to Anderson himself if he was not killed but was disabled. We cannot hold the legislature so intended. A statute which would make the seller of liquor responsible for all the acts of the buyer while intoxicated thereby, when the acts were not in any way caused by the intoxication, would in our judgment be so unreasonable as to be invalid. Liquor dealers may very properly be held responsible for the natural results of their traffic, but not for conduct which is in no way caused by it.''

We are of the opinion that in cases that fall within the classification of the case at bar that section 14 of the Dram Shop Act provides a remedy to one injured in his person or property by an intoxicated person against the tavern keeper and his landlord in order to compensate for the tortious acts of the intoxicated person. The act does not create a right of action for all acts of intoxicated persons, but only for the tortious acts of intoxicated persons. In this class of cases the act gives a right of action against the dram shop keeper and his landlord in addition to the one given by the common law, against the tortfeasor. We have been unable to find a case where such a statement is made, but we believe that this is the law that has been applied in all the reported cases. In the *Sauter* case the court recognized that there could be no recovery against the tavern keeper and landlord where the intoxicated person killed his assailant in necessary self defense. In the *O'Reilly* case the intoxicated person caused the death of a horse by over-driving it while he was intoxicated. In the *Wilson* case the wife was assaulted by her husband while he was intoxicated. In the *Aldrich* case plaintiff was injured by the reckless driv-

ing of a horse by an intoxicated person. We conclude that in the instant case it was necessary for plaintiff to prove by a preponderance of the evidence that the tavern keeper sold intoxicating liquor to Sol; that his intoxication was caused in whole or in part by the sale of the liquor; that Sol was guilty of negligence which was the proximate cause of the plaintiff's injuries; that plaintiff was in the exercise of due care for her own safety, and the damages. There was evidence that the tavern keeper sold intoxicating liquor to Sol, that as a result he became intoxicated and that plaintiff was injured when the door closed pinching one of her fingers. We turn to a consideration of whether there is any evidence that the injuries sustained by plaintiff were caused by the wrongful or tortious act of Sol, the alleged intoxicated person. The rule is that negligence and contributory negligence are questions of fact for the jury. They become questions of law only when the evidence is so clearly insufficient to establish negligence or due care that all reasonable minds would reach the conclusion that there was no negligence, or that there was contributory negligence. A motion to direct a verdict for the defendants or for a judgment notwithstanding the verdict preserves for review only a question of law, whether from the evidence in favor of plaintiff, standing alone and when considered to be true, together with the inferences which may legitimately be drawn therefrom, the jury might reasonably have found for plaintiff. The only evidence in the record that the injury to plaintiff was caused by an intoxicated person is plaintiff's own testimony. She testified that Sol came staggering toward the door from the rear of the bar; that as he started toward the door he bumped it with his shoulder, and as it started to close, he fell against it and the first thing she knew her finger was caught in the door. She did not testify as to any facts from which the jury could infer that Sol knew or should have known that her finger was

on the door jamb and was in a position of danger. Plaintiff was not conscious that her own finger was in the crack between the door and the jamb, for she testified: "I didn't notice my finger, but it must have been." In the absence of evidence that Sol knew or should have known that plaintiff's finger was in a position of danger, she has failed to establish that Sol owed any legal duty to her for breach of which she would be entitled to an action against defendants for damages caused by an intoxicated person under the Dram Shop Act. We are of the opinion that as there was no evidence of negligent conduct on the part of Sol, it was the duty of the court to direct a verdict at the close of all the evidence. We find further that as a matter of law, plaintiff was guilty of contributory negligence which was the proximate cause of the injury. She testified that she observed Sol leaving the rear end of the bar and staggered up to the door, falling against it, causing it to start to close, then straightening up and again falling back against the door from the side, pushing it all the way shut. She not only placed her finger in a dangerous place, but she permitted her finger to remain in a dangerous place when she knew Sol was approaching the door. We are of the opinion that all reasonable minds would draw but one conclusion, namely, that plaintiff was guilty of negligence which proximately contributed to the injury, and that the trial court should have directed a verdict for the defendants.

Defendants maintain that in the alternative the trial court should have allowed defendants' motion for a new trial because the verdict is against the manifest weight of the evidence. The only testimony that there was an intoxicated person named Sol who slammed the vestibule door on plaintiff's finger is the uncorroborated testimony of plaintiff. She described Sol: "This man I know as Sol is not tall, nor is he light but he is not fat." She stated that she did not recognize

Fred Solomon, the witness who testified for the defendants. He testified that he was known as "Sol." She said she saw Fred Solomon the day of the trial, but "never saw him before that I know of." Fred Solomon took her to the doctor's office, and according to all the testimony except that of plaintiff, he was the only person in the tavern at the time by the name of Sol. She testified that while she was eating she observed Sol drinking and that she saw "each drink that was served to him," and that "in each case I saw him actually pick up the glass and drink the drink." The music box was to the west of the vestibule at the front end of the tavern, on the same side of the tavern as the bar and facing south, and when she was looking at the selections she was facing to the front of the tavern, or north. In order for her to read the selections she had to bend her head and lean forward. At the time she was selecting a record and while in a position which required her to follow the list of selections with her left hand, and facing north, according to her testimony "Sol came staggering down and started out the door, which he bumped, and as he started to close it he fell back against it, and the first thing I knew my finger was caught in the door." On cross-examination she testified that after she got up to the music box she observed Sol got off his stool and staggered up to the front door. It is obvious that plaintiff could not have seen what Sol was doing while she was facing in the opposite direction. Having observed Sol for an appreciable time while she was eating lunch, it is remarkable that she was not able to give a better description of him. In fact, she gives no description. She merely states what he was not. Raymond Bruski, the newsman, testified that he was standing in the vestibule warming up at the time of the accident; that he heard plaintiff gasp; that at that time he was the only one within arm's reach of the door; that Pike, plaintiff's father, had just gone out; that it took some time for

the door to slam, and that at the time of the accident no one else touched the door beside Pike. Pike did not go to the doctor's office with his daughter. He arrived there in about 20 minutes and accompanied her home. Fred Solomon testified he did not hear any one in the tavern identified as being plaintiff's father. James Terry testified that Pike was not in the tavern at the time first aid was being given plaintiff. Miss Frances Terry testified that Pike was not in the tavern when she arrived on the scene of the accident. Plaintiff states that her father was crippled, which was the reason he did not accompany her to the doctor's office. At the time of the trial he was working in a shipyard in Texas. He did not testify as a witness, nor was his deposition taken. Defendants state that the testimony of Raymond Bruski that Pike slammed the door, which injured his daughter, is the only explanation of the accident worthy of belief. There is no evidence in the record that Pike was intoxicated. We are convinced that the verdict is against the manifest weight of the evidence. It is unnecessary to consider the final point urged by defendants, that the verdict is excessive.

Because of these views the judgment of the superior court of Cook county is reversed and the cause remanded with directions to enter a judgment notwithstanding the verdict for the defendants and against plaintiff.

*Judgment reversed and cause remanded with directions.*

KILEY, J., concurs.

HEBEL, P. J., took no part.